1

2

3

4

5

6

7

8

9                 IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12 DAMON D. EVANS,

13           Plaintiff,             No. CIV S-02-2202 GEB KJM P

14    vs.

15 EDWARD S. ALAMEIDA, JR., et al.,       <u>FINDINGS AND RECOMMENDATIONS</u>

16          Defendants.

17 _____/

18        Plaintiff is a California prisoner proceeding pro se with a complaint under 42

19 U.S.C. § 1983, alleging that defendants violated his Eighth Amendment rights.  The defendants

20 remaining after the court's partial grant of defendants' motion to dismiss are the following:

21 Aguinaldo (escorting officer), Alameida (Director), Campbell (escorting officer), Carpenter

22 (supervisor), Celis (escorting officer), Colon (Chief Deputy Warden)[1], Cooper (escorting officer),

23

24       [1] A notice of suggestion of death on the record of defendant Colon was lodged with the
court on June 24, 2005.  Plaintiff has not moved for the substitution of Colon's legal

25 representative.  The action must be dismissed as to him.  <u>Weil v. Investment/Indicators,
Research and Management, Inc.</u>, 647 F.2d 18, 21 n.5 (9th Cir. 1981); Fed. R. Civ. P. 25(a)(1).

26

Corr (escorting officer), Hestand (escorting officer), Ingwerson (escorting officer), Prater (escorting officer), Lynn (supervisor), Martin (supervisor), Runnels (Warden), Van Leer (supervisor) and Welch (escorting officer).  Defendants have filed the instant motion for summary judgment.  Upon review of the documents in support and opposition and good cause appearing therefor, THE COURT FINDS AS FOLLOWS:

I.      Procedural History

        A.      Plaintiff's First Amended Complaint

                Plaintiff's amended complaint expressly states two causes of actions, each against separate sets of defendants.  The first cause of action alleges violation of the Eighth Amendment through the use of excessive force.  First Amended Complaint (Am. Compl.) at ¶ 59.  The second cause of action alleges failure to train and supervise the defendants named in the first cause of action.  Id. at ¶ 60.

                In the prayer for relief, plaintiff seeks an injunction against the defendants, their agents, employees, personnel and officials of the Department of Corrections to prevent further use of the tactics against prisoners described in the complaint.  Id. at 15.  Plaintiff also seeks punitive and emotional distress damages from the defendants.  Id. at 16.

        B.      The Motion To Dismiss

                On September 27, 2004, the court granted defendants' motion to dismiss for failure to state a claim in part.  Several defendants were dismissed as was plaintiff's verbal harassment claim.  The motion also was granted to the extent plaintiff sought damages from defendants in their official capacities.

                As to the excessive force claim, the court denied the motion to dismiss, finding that plaintiff's injuries were not *de minimis* in that plaintiff suffered "abrasions and bleeding." Findings and Recommendations filed August 25, 2004 (F&Rs) at 10; Order filed September 27, 2004.  Because the injuries were not *de minimis,* the court determined that the claim for emotional distress damages under 42 U.S.C. § 1997e(e) was proper.  F&Rs at 10.

2

1    As to the failure to train claim, the court found the claim against the defendants

2    who were present during the escort in their supervisory roles was sufficient.  Id. at 11.   Similarly,

3    the court found plaintiff may be able to show that defendants Alameida, Runnels and Colon

4    failed to train and/or supervise the other defendants and that this failure contributed to the

5    claimed Eighth Amendment violations.  Id.

6    II.    Factual Background

7         A.    Plaintiff's Assault Of Correctional Officer

8         At approximately 3:30 p.m. on June 10, 2001, plaintiff and inmate Watkins,

9    inmates at High Desert State Prison, attacked Correctional Officer Fobes during a controlled

10   release for showers.  Def'ts' Statement of Undisputed Facts ("UF"), No. 3.  Officer Fobes was

11   knocked to the floor and plaintiff stomped on Officer Fobes' head at least once.  UF, No. 4.

12   Plaintiff and Watkins assaulted defendant Carpenter and Officer Harcourt when they attempted to

13   intervene.  UF, No. 5.  The assault stopped when plaintiff was shot in the neck with a 37mm gun

14   loaded with a foam round.  UF, No. 9; Depo. of Dan Evans (Evans Depo.) at 14:9-11.[2]

15   After being shot, plaintiff was lying on his back either one or two feet away from

16   Officer Fobes, who also was lying on the floor.  Pl.'s Resp. to UF ("RUF"), No. 16; Interrogatory

17   Responses of Celis (Set One) at 4:16.[3]  Defendant Celis knelt on plaintiff's neck while Carpenter

18   handcuffed plaintiff.  UF, No. 13.  Plaintiff asked Celis if he could loosen the handcuffs and

19   Celis responded, "Shut the fuck up!"  Pl.'s Statement of Disputed Facts ("DF"), No. 15; Evans

20   Depo. at 16:14-25.  Defendants Campbell and Prater then dragged plaintiff twenty to twenty-five

21   feet and placed plaintiff on his stomach, with his head turned away from Officer Fobes.  UF, No.

22   19.  Plaintiff alleges the dragging caused abrasions to his knees.  UF, No. 20.  Further, plaintiff

23

24   [2]  The Evans deposition has been lodged with the court in accordance with  Local Rule 5-133(j).

25

26   [3]  Defendants' interrogatory responses have been filed as exhibits to plaintiff's response to defendants' statement of undisputed facts.

alleges that the dragging was unnecessary because plaintiff posed no threat at that point and there were officers around Officer Fobes and plaintiff. DF, No. 13.

B.     Plaintiff's Escort To Holding Cell, Examination By Medical Technician, And Escort To Administrative Segregation

Defendant Ingwerson applied plaintiff's leg restraints. Interrogatory Responses of Ingwerson (Set One) at 4:13-14. Plaintiff tried to tell Ingwerson the leg restraints were too tight, but other officers, whom plaintiff cannot identify, told plaintiff to shut up. Evans Depo. at 27:1-3. Id. Plaintiff's hands were handcuffed behind his back.

Ingwerson was to plaintiff's left during this phase of the escort. UF, No. 24; Evans Depo. at 31:4-12. Defendant Welch was to plaintiff's right. UF, No. 24; Evans Depo. at 31:4-12. Defendants Corr, Aguinaldo, and perhaps Lynn,[4] walked behind plaintiff. DF, No. 27; Evans Depo. at 25:1-26:2; Interrogatory Responses of Lynn (Set One) at 4:6-12. Plaintiff alleges that either Corr or Aguinaldo or both kicked plaintiff's heels about three to four times during the escort. DF, No. 28; Evans Depo. at 34:9-23. Defendants have submitted a video of the escort. See Ex. J.[5] While the video provides an extremely poor visual depiction of the upper half of the bodies of the men, and the audio is hard to hear, it does not show the feet or legs of plaintiff and the escorting officers.

/////

/////

---

[4] Plaintiff states that Corr and Aguinaldo were behind plaintiff, making no reference to the location of Lynn. RUF, No. 27. It is not stated in the record where Lynn was located in relationship to Evans during the escort. Plaintiff states in his deposition that Lynn and Martin supervised his escort to Administrative Segregation. Evans Depo. at 25:1-26:2. However, according to interrogatory responses, Lynn but not Martin supervised the escort. Interrogatory Responses of Lynn (Set One) at 4:6-12; Interrogatory Responses of Martin (Set One) at 4:6-17.

[5] The video is Exhibit J to Defendants' Statement of Undisputed Facts. Plaintiff's Opposition to Summary Judgment also lists the video as Exhibit J. Therefore, the court will refer to the video simply as Exhibit J. The video depicts the beginning of the escort, the medical examination, the continuation of the escort to the holding cell in Administrative Segregation, and the final segment of the escort from Administrative Segregation to Receiving and Release.

4

1    Plaintiff was taken initially to a holding cell where Medical Technical Assistant

2  ("MTA") Martin examined plaintiff.[6]  Plaintiff alleges he complained of the tightness of the

3  restraints at this time and MTA Martin looked at the cut on his leg.  Evans Depo. at 17:15-25,

4  27:6-22.  Plaintiff further alleges that MTA Martin asked the officers if they could remove the

5  restraints, and the defendants responded that it was up to the sergeant.  Id. at 17:15-25.   There is

6  no indication that any restraints were removed in the holding cell.  Evans Depo. at 17:15-21;

7  Interrogatory Responses of Lynn (Set One) at 4:8-11.  The video shows plaintiff in handcuffs

8  while in the holding cell.  Exhibit J.

9    After what appears to be a relatively brief period of time, the same officers

10  continued to escort plaintiff to Administrative Segregation.[7]  The video demonstrates that during

11  this phase of  the escort, either or both of the officers at plaintiff's sides held plaintiff's hands up,

12  and plaintiff leaned forward noticeably during the walk.  At certain points plaintiff's handcuffed

13  hands are held behind the upper portion of plaintiff's back.  While it is unclear from the video

14  whether any one officer is pushing plaintiff's hands up, plaintiff identifies Ingwerson, stating:

15           At one point the escort Officer Ingwerson had his right arm go
             under my left arm while it was bent and rested both his hands on
16           my left shoulder... At another point on the escort Officer Ingwerson
             held my left hand at my right shoulder where I have a tatoo (sic.).
17

18  DF, Nos. 18-19.

19    Upon arrival at Administrative Segregation, plaintiff was placed in a cell and the

20  restraints were removed.  Interrogatory Responses of Lynn (Set One) at 4:10-11; Interrogatory

21  Responses of Ingwerson (Set One) at 4:11-17; Interrogatory Responses of Welch (Set One) at

22  4:11-21.

23

24    [6] MTA Martin and Defendant Martin are two separate individuals.

25    [7] It is not clear if Lynn was present during this stage of the escort.  See Interrogatory
    Responses of Lynn (Set One) at 4:8 ("I supervised the escort of Evans to the medical clinic in D
26  Facility.").

5

1    About ten minutes later, plaintiff says he observed other prisoners getting fed.

2  Evans Depo. at 36:21-23.  Plaintiff alleges that another officer asked Aguinaldo if plaintiff would

3  be fed and Aguinaldo replied, "No.  That fucker don't deserve shit."  Id. at 36:25-37:2.  Plaintiff

4  did not receive dinner that evening or breakfast the next morning.  DF, No. 71.

5    MTA Martin stopped by plaintiff's cell in Administrative Segregation to tell

6  plaintiff he had left ice and Band-Aids for plaintiff.  UF, No. 73; Evans Depo. at 35:18-22.

7  Plaintiff claims he never received the supplies, but plaintiff cannot identify anyone who would

8  have been responsible for giving plaintiff the items.  UF, No. 74; Evans Depo. at 39:6-10.

9    C.    Plaintiff's Escort To Receiving And Release

10    On the evening of June 10, 2004, plaintiff was escorted to Receiving and Release.

11 UF, Nos. 43-44; Evans Depo. at 40:12-14.   An officer unknown to plaintiff allegedly applied the

12 restraints too tightly.  UF, No. 41.  Defendant Cooper was to plaintiff's right and defendant

13 Hestand to plaintiff's left.  UF, No. 45.  Defendants Aguinaldo, Lynn and Martin walked behind

14 plaintiff.[8]  UF, Nos. 44, 47.

15    Plaintiff alleges that these defendants continued to hold his hands up in the same

16 manner as during the prior escort.  Evans Depo. at 42:3-5.  However, the video indicates

17 plaintiff's hands are held lower than during the escort to Administrative Segregation.  Exhibit J.

18    During this escort, plaintiff alleges that Aguinaldo kicked him one time, causing

19 him to fall forward.  DF, Nos. 48-49; Evans Depo. at 42:6-15.  As plaintiff fell to the ground,

20 Cooper, Hestand, and Aguinaldo fell on top of him.  UF, No. 53; Exhibit J.  Plaintiff alleges the

21 officers "slammed" him to the ground.  Evans Depo. at 42:14-22.  Plaintiff scraped his shoulder

22 when he fell.  UF, No. 54; Evans Depo. at 43:6-44:6.  Plaintiff was held to the ground until

23 Martin instructed the officers to return plaintiff to his feet.  UF, No. 53.

24 ─────────────────

25    [8] The videotape of the escort shows five officers involved in the escort.  At one point, when plaintiff fell, three officers emerged from behind plaintiff.  See Exhibit J.  This footage is consistent with the identification of Aguinaldo, Martin and Lynn as having walked behind

26 plaintiff.

1    Aguinaldo denies kicking plaintiff.  Interrogatory Responses of Aguinaldo (Set

2  One) at 4:19-24.  Both Martin and Aguinaldo claim they thought plaintiff was resisting.  UF, No.

3  50 ("To Sergeant Martin it appeared that Evans lunged forward and to the left.  Officer

4  Aguinaldo thought that Evans was attempting to resist the escort.").  However, Lynn and Cooper

5  felt that plaintiff merely fell down.  Interrogatory Responses of Lynn (Set One) at 4:13-14

6  ("During the escort Evans turned to his left and fell down."); Interrogatory Responses of Cooper

7  (Set One) at 12-13 ("The escort was proceeding without incident until Evans tripped on his leg

8  irons.").  Correctional officers are trained to use their body weight to take an inmate down to the

9  ground if he attempts to pull away from the escorting officers.  UF, No. 51.

10    Plaintiff alleges that at the end of the escort he was placed in a holding cell in

11  Receiving and Release with his restraints still on.  Am. Compl. at ¶ 46.  Plaintiff also alleges he

12  later asked if the restraints could be loosened because the restraints were "starting to cut

13  [plaintiff's] ankles."  Id.  Allegedly, Van Leer replied, "No."  Id.  Defendants assert that Van Leer

14  "is entitled to summary judgment as he had no personal involvement in either of Evans' escorts."

15  Def'ts' Mem. P. & A. in Supp. Mot. for Summ. J. (MSJ) at 18.  While defendants dispute any

16  allegation regarding Van Leer's conduct during the escort, defendants do not dispute Van Leer's

17  conduct after the escort, which is when plaintiff alleges Van Leer violated his rights.

18    A medical examination was conducted on plaintiff in plaintiff's cell in Receiving

19  and Release at 9:15 p.m.  UF, No. 57.  The medical documentation noted a superficial abrasion

20  on the back of plaintiff's left shoulder and on the front of his left knee.  Id.; UF, Ex. P.  The

21  examiner listed Van Leer as a witness.  Id.

22    Plaintiff was again examined in Receiving and Release at 12:40 a.m.  The MTA

23  noted abrasions to Evans' ankles, a two inch red mark on the right wrist, and an abrasion on the

24  third knuckle of plaintiff's right hand.  UF, No. 58.

25  /////

26  /////

1      D.      Plaintiff's Arrival At Pelican Bay State Prison

2              Plaintiff alleges he arrived at Pelican Bay State Prison between 6:00 and 7:00 a.m.

3  the following morning.  Evans Depo. at 38:20-25.  Plaintiff alleges he did not receive breakfast,

4  but was fed lunch.  Id. at 20-22.

5              Plaintiff was medically examined upon his arrival.  The following summary of the

6  medical report is undisputed.  Defendants state:

7              The report noted a superficial abrasion to Evans' forehead, a one
               quarter centimeter abrasion to the right knee, a three and one
8              quarter centimeter abrasion to the left knee, approximately one
               inch abrasions to both ankles, a purple area to the left neck, a three
9              inch superficial abrasion and a three and one-half inch purple area
               on the left shoulder, a one inch purple area to the left elbow, an
10             abrasion to the left hand and a swollen area, with complaints of
               pain, to the back of the right hand.  There were no abrasions or red
11             marks on the wrists.

12  UF, No. 59.[9]  Furthermore, in his deposition, plaintiff states he went to the doctor about soreness

13  in his shoulders, the doctor x-rayed and "everything came back negative."  Evans Depo. at 33:2-

14  5.[10]

15  III.    Standard for Summary Judgment

16              Summary judgment is appropriate when it is demonstrated that there exists "no

17  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

18  matter of law."  Fed. R. Civ. P. 56(c).

19  /////

20  /////

21  _____

22      [9]  The medical report is attached to Defendants' Statement of Undisputed Facts as Exhibit
    R.  The medical report has not been authenticated in accordance with Fed. R. Evid. 901.
23  "[U]nauthenticated documents cannot be considered in a motion for summary judgment."  Orr v.
    Bank of America, 285 F.3d 764, 773 (9th Cir. 2002).  Here, however, plaintiff admits that the
    medical report states what defendants claim, and thus the court considers the contents of the
24  report.  See  Hal Roach Studios v.  Feiner, 896 F.2d 1542, 1551 (9th Cir. 1989).

25      [10]  The x-ray report included in Exhibit R also is not authenticated.  Because it is unclear
    whether plaintiff adopts the x-ray report, the court does not consider the x-ray in the instant
26  motion.  See Orr, 285 F.3d at 773.

8

1    Under summary judgment practice, the moving party

2    always bears the initial responsibility of informing the district court
     of the basis for its motion, and identifying those portions of "the
3    pleadings, depositions, answers to interrogatories, and admissions
     on file, together with the affidavits, if any," which it believes
4    demonstrate the absence of a genuine issue of material fact.

5    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the

6    nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

7    judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

8    to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered,

9    after adequate time for discovery and upon motion, against a party who fails to make a showing

10   sufficient to establish the existence of an element essential to that party's case, and on which that

11   party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof

12   concerning an essential element of the nonmoving party's case necessarily renders all other facts

13   immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as

14   whatever is before the district court demonstrates that the standard for entry of summary

15   judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

16        If the moving party meets its initial responsibility, the burden then shifts to the

17   opposing party to establish that a genuine issue as to any material fact actually does exist. See

18   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

19   establish the existence of this factual dispute, the opposing party may not rely upon the

20   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

21   form of affidavits, and/or admissible discovery material, in support of its contention that the

22   dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

23   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

24   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

25   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

26   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

9

1  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2  1436 (9th Cir. 1987).

3         In the endeavor to establish the existence of a factual dispute, the opposing party

4  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

9  committee's note on 1963 amendments).

10        In resolving the summary judgment motion, the court examines the pleadings,

11  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

13  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

14  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

15  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

16  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

17  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

18  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

19  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

20  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

22        On June 20, 2003, the court advised plaintiff of the requirements for opposing a

23  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

24  F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999); Klingele v.

25  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

26  /////

IV.    Plaintiff's Admissions Release Three Defendants From Liability

        "Evans is suing defendants Alameida, Runnels and Colon, only because they
denied his administrative appeal."  UF, No. 80.  In plaintiff's deposition, regarding Alameida,
Runnels and Colon, plaintiff confirms as much:

> Q.  So, basically, their participation was to deny your appeal?
> A.  Yes.
> Q.  Any other reason you are suing them?
> A.  That was it.

Evans Depo. at 47:5-10.

        In his second cause of action, plaintiff alleges that Alameida, Runnels and Colon
failed to train and supervise the other defendants.  Am. Compl. at ¶ 60.  Filing suit based on a
denial of an administrative appeal is unrelated to the failure to train and supervise cause of
action.  Because plaintiff now has admitted that he only sued these three defendants for denying
his administrative appeal, there is no factual dispute as to any failure to supervise and train.

        Furthermore, there is no cause of action for denial of an administrative appeal.
See 42 U.S.C. § 1997e(d) ("the failure of a State to adopt or adhere to an administrative
grievance procedure consistent with this section shall not constitute the basis for an action under
section 1997a or 1997c of this title").

        Therefore, defendants' motion for summary judgment should be granted as to
Alameida and Runnels and the case should be dismissed as to Colon.[11]

V.    The Eighth Amendment Claim

        A.    Excessive Force

                1.    In Context Of Assault On Officer Fobes

        Plaintiff's first cause of action is based on alleged violations of the Eighth
Amendment.  Plaintiff alleges that defendants Aguinaldo, Campbell, Carpenter, Celis, Cooper,

---

[11] See note 1 supra.

11

1  Corr, Hestand, Ingwerson, Lynn, Prater and Welch all used excessive force.  Am. Compl. at ¶ 59.

2          Determining whether an Eighth Amendment violation has occurred depends on

3  the context in which the action takes place.  Deference is to be given to the quick decisions

4  officers must make when responding to a confrontation with "riotous inmates."  Whitley v.

5  Albers, 475 U.S. 312, 320-22 (1986).  A deferential standard applies even in the case of "a lesser

6  disruption," so long as it is necessary for guards to use force to keep order.  Hudson v.

7  McMillian, 503 U.S. 1, 6 (1992).  In the case of resistance, the determinative question is

8  "whether force was applied in a good faith effort to maintain or restore discipline or maliciously

9  and sadistically for the purpose of causing harm."  Id. at 7.

10          The Ninth Circuit has relied on factors enumerated in Hudson in determining

11  whether an officer's application of force was applied in a good faith effort to restore discipline.

12  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).  These factors are: 1) the extent of the

13  injury suffered by an inmate; 2) the need for application of force; 3) the relationship between that

14  need and the amount of force used; 4) the threat reasonably perceived by the responsible

15  officials; and 5) any efforts made to temper the severity of a forceful response.  Id.

16          According to the Ninth Circuit, Hudson mandates that the Whitley standard apply

17  in all cases of excessive force claims against prison officials.  Lemaire v. Maas, 12 F.3d 1444-53

18  & n.2 (9th Cir. 1993).  However, when there is no obvious disturbance, it is crucial to scrutinize

19  the two elements of the Eighth Amendment inquiry:  1) the deprivation must be sufficiently

20  serious, and 2) the officer must have acted with a sufficiently culpable state of mind.  Wilson v.

21  Seiter, 501 U.S. 294, 298 (1991).

22          Significant injury does not have to be evident for there to be a violation of the

23  Eighth Amendment.  Hudson, 503 U.S. at 9.  "When prison officials maliciously and sadistically

24  use force to cause harm, contemporary standards of decency always are violated."  Id.  However,

25  the deprivation, meaning the use of force, must be more than de minimis.  Id. at 9-10.  The extent

26  of the injury is therefore relevant to determine if the use of force is more than de minimis.  Id. at

7 ("The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but

does not end it").

When a prisoner alleges damages for emotional distress, he or she must satisfy the

physical injury requirement of 42 U.S.C. §1997e(e).  The Ninth Circuit has adopted the rule that

§1997e(e) requires there to be more than *de minimis* physical injury for the court to award

emotional distress damages.  Oliver v. Keller, 289 F.3d 623, 630 (9th Cir. 2002).  However, the

Oliver court expressly stated that its holding did not apply to claims for compensatory, nominal

or punitive damages.  Id.  The Oliver court further stated that it does not adopt the rule that *de*

*minimis* injury is required to allege a violation of the Eighth Amendment, assuming emotional

damages are not at issue.  Id. at 628 ("In Hudson, the Court held that '*de minimis* uses of physical

force' are not constitutional violations, focusing on the amount of *force* used, not the nature or

severity of the *injury* inflicted" (emphasis in original; internal citation omitted)).  Therefore, a

prisoner with an Eighth Amendment claim can proceed with *de minimis* physical injury, so long

as the officers, with culpable intent, exerted more than *de minimis* physical force and the prisoner

seeks other than emotional distress damages.

The actions of defendants Campbell, Carpenter, Celis and Prater took place in the

context of a disturbance that called for the use of force.  Plaintiff and another inmate attacked

Correctional Officer Fobes while they were not in restraints during a release for showers.  UF,

No. 3.  Plaintiff and Watkins assaulted Carpenter and Officer Harcourt when they tried to

intervene.  UF, No. 5.  Although the assault stopped when plaintiff was shot in the neck with a

foam-loaded gun, plaintiff remained conscious.  UF, No. 9.  Restraints needed to be applied

rapidly to ensure plaintiff did not renew his assault.  Celis knelt on plaintiff's neck while

Carpenter allegedly applied the handcuffs too tightly.  UF, No. 13.  Plaintiff's Eighth

Amendment claim against Celis and Carpenter is based on this incident.

Under the Hudson factors, Celis and Carpenter were acting in good faith.  It is

undisputed that plaintiff did not suffer significant injury from the allegedly tight application of

13

1   the handcuffs until a longer period of time had passed.  While lack of significant injury is not

2   determinative, it indicates that defendants were not acting maliciously and sadistically.  Hudson,

3   503 U.S. at 7 ("The extent of injury suffered by an inmate is one factor that may suggest 'whether

4   the use of force could plausibly have been thought necessary'" (internal citation omitted)).  There

5   also is no genuine issue of fact but that Celis knelt on plaintiff's neck only as long as it took to

6   apply the handcuffs and such force was necessary to restrain plaintiff because plaintiff had

7   resisted the other officers' attempts to restrain him.  The handcuffs were the only restraint used

8   and if they were applied too tightly, it was a consequence of the officers' need to restrain plaintiff

9   quickly to prevent further injury to others.  While loosening plaintiff's handcuffs could have

10  tempered the severity of the response, leaving the only restraints in place until the situation was

11  under control was not improper under the circumstances.  Plaintiff had attacked three officers

12  moments beforehand; therefore, it was reasonable to perceive plaintiff as a threat.  On the record

13  before the court, it can be concluded as a matter of law that Celis and Carpenter used force in a

14  good faith attempt to restore discipline.  Id.

15          Campbell and Prater also did not violate plaintiff's Eighth Amendment rights

16  when they dragged plaintiff twenty to twenty-five feet away from where he originally lay.  It is

17  undisputed that the dragging caused abrasions to plaintiff's knees.  UF, No. 20.  This injury

18  possibly could have been avoided if the officers had applied leg restraints and escorted plaintiff

19  to another location.  However, the officers' decision to drag plaintiff was not irrational in light of

20  the fact that Officer Fobes was injured and lying on the ground only two feet away from plaintiff.

21  DF, No. 16; Interrogatory Responses of Celis (Set One) at 4:16.  Lying next to the injured officer,

22  there were numerous ways plaintiff could unquestionably have aggravated the situation, even in

23  handcuffs.  Quickly removing plaintiff from the scene and placing him with his head turned away

24  from Officer Fobes represents a good faith effort to restore order and discipline.  Campbell and

25  Prater did not have to choose the most reasonable course of conduct in handling the disruption,

26  but merely had to act in good faith.  Hudson, 503 U.S. at 7; Whitley, 475 U.S. at 319 ("The

14

1   infliction of pain in the course of a prison security measure, therefore, does not amount to cruel

2   and unusual punishment simply because it may appear in retrospect that the degree of force

3   authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict

4   sense.").

5        By the time of the rest of the actions forming the basis of plaintiff's other

6   allegations against Aguinaldo, Cooper, Corr, Hestand, Ingwerson, Lynn, Martin and Welch,

7   however, the disruption caused by plaintiff's assault of Officer Fobes in the shower room was

8   under control.  As discussed below, there are triable issues of fact as to whether the action of

9   these defendants, excepting Martin, were sufficiently serious and conducted with the requisite

10  culpable state of mind.

11            2.        Escort To Administrative Segregation

12       There are triable issues of material fact as to whether Ingwerson applied the leg

13  restraints too tightly and whether Ingwerson knew they were too tight.  Plaintiff stated he "tried

14  to" notify Ingwerson that the restraints were too tight.  Evans Depo. at 27:1-3.  If the trier of fact

15  determines that Ingwerson was put on notice that the leg restraints were too tight, then

16  Ingwerson's refusal to check the restraints sometime during the escort to ensure they were

17  applied appropriately may be determined to be malicious conduct.  Considering the length of the

18  escort to Administrative Segregation, the deprivation is not *de minimis* if Ingwerson initially

19  applied the restraints too tightly.

20       There also is a disputed material issue of fact as to whether the plaintiff's injury

21  caused by Ingwerson's application of the leg restraints is *de minimis*.  This inquiry is relevant to

22  determine if plaintiff may be awarded the emotional distress damages he seeks.  Am. Compl.

23  ¶ 61 (9).  Defendants have submitted unauthenticated medical records in support of their claim

24

25

26

                                        15

that plaintiff suffered no injury.[12]  Plaintiff states that the leg restraints cut into the front and back

of his leg.  Evans Depo. at 27:12-22.  Also, when plaintiff was examined at the end of the night,

the examiner noted abrasions to plaintiff's ankles.[13]  UF, No. 58.

There are additional triable issues of material fact as to whether and how many

times Corr or Aguinaldo kicked plaintiff's heels during the escort to Administrative

Segregation,[14] and whether either defendant did so intentionally.  In Hudson, the court found that

the officers who punched and kicked the plaintiff violated the Eighth Amendment.  Hudson, 503

U.S. at 4, 10.  Considering the length of time plaintiff had to walk with restraints on his ankles, if

plaintiff's heels were kicked three to four times, as he alleges, a trier of fact could find intentional

kicking sufficiently serious to constitute a violation of the Eighth Amendment.  Id.

There are further triable issues of material fact as to whether Ingwerson and/or

Welch were holding plaintiff's hands too high behind his back during the escort to

Administrative Segregation and as to whether a defendant acted with a sufficiently culpable state

of mind.  Because plaintiff had restraints on his legs and feet and was accompanied by four

officers, there is a factual dispute as to whether the only purpose of holding plaintiff's hands up

high was to inflict pain, or whether doing so was an effective way to prevent further resistance by

an agitated, belligerent inmate.  See White v. Roper, 901 F.2d 1501, 1504 (9th Cir. 1990)

("Absent a showing of an express intent to punish, whether a particular action taken by jail

officials amounts to punishment 'generally will turn on 'whether an alternative purpose to which

[12] Exhibits are not authenticated merely by attaching them to a pleading or affidavit in support of a motion for summary judgment.  See United States. v. Dibble, 429 F.2d 598, 602 (9th Cir. 1970); see also note 9 supra.

[13] The leg restraints were removed and applied again by another officer, unknown to plaintiff, before plaintiff noted his legs were bleeding.  Evans Depo. at 29:6-30:25.  Also, plaintiff alleges he was kicked by other officers during both escorts, which could have caused injury to his legs.  Evans Depo. at 34:16-23; DF, Nos. 48-49.  None of these additional facts eliminate a dispute as to Ingwerson's responsibility.

[14] Exhibit J, the videotape, only shows the upper bodies of defendants and plaintiff. Therefore, the tape does not eliminate a factual dispute as to whether defendants kicked plaintiff.

[the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" (internal citations omitted; brackets in original)).  Additionally, considering the long escort to Administrative Segregation, which the plaintiff avers he experienced in pain, and plaintiff's soreness in his shoulders that lasted for a couple of weeks,  Evans Depo. 32:20-33:5, the use of force in the instant case may not be *de minimis* and plaintiff may be eligible for emotional distress damages.  <u>Contra</u> <u>Oliver</u>, 289 F.3d at 629 (plaintiff trivialized his injury and did not seek medical treatment).

### 3.    Time Spent In Examination Cell

There is a triable issue of material fact as to whether plaintiff complained to MTA Martin, in the presence of defendants Ingwerson, Welch, Corr, Aguinaldo and/or Lynn, about the restraints being too tight.  Plaintiff avers that MTA Martin then asked these defendants if they could remove the restraints.  Evans Depo. at 17:15-25.  If the defendants knew that plaintiff's restraints were too tight, their refusal to check the restraints could be found to demonstrate a culpable state of mind.  If the handcuffs were in fact applied too tightly, the use of force during the escort from the examination cell to the final holding cell in Administrative Segregation could be determined to be more than *de minimis*.  <u>See also</u> Ex. J (hands held high; abrasions to plaintiff's wrists visible when handcuffs were removed).  The existence of abrasions could be enough to support an award of emotional distress damages as well, a question of fact this court cannot resolve on summary judgment.

### 4.    Escort To Receiving And Release

Plaintiff also asserts that the restraints were applied too tightly prior to his escort to Receiving and Release.  Am. Compl. ¶ 44.  Plaintiff does not know who applied the restraints for this escort and he does not allege he notified any defendant that the restraints were too tight until after plaintiff was placed in a holding cell at the end of the escort.  There is no triable issue of fact as to whether the defendants escorting plaintiff at this stage had the requisite culpable

/////

17

1    intent for an Eighth Amendment violation.  Defendants thus should be granted summary

2    judgment as to this aspect of plaintiff's excessive force claim.

3            Plaintiff says his arms were being held in the same manner during the escort from

4    Administrative Segregation to Receiving and Release as in the earlier escort.  Evans Depo. at

5    42:3-5.  In the video of this portion of the escort, however, at no time do plaintiff's hands appear

6    held up behind  his upper back.  Exhibit J.  To further support his position, plaintiff has

7    submitted a videotape showing what he considers to be a proper escort conducted with him at

8    Pelican Bay State Prison;[15] in this video exhibit, the officers virtually do not touch plaintiff while

9    he is escorted.  The fact that the officers in the instant case held plaintiff's arms, without more,

10   does not give rise to a disputed issue of material fact as to the use of force because there is

11   nothing to show that plaintiff's arms were held in an uncomfortable, awkward or painful

12   position.  Hudson, 503 U.S. at 9 ("not . . .every malevolent touch by a prison guard gives rise to a

13   federal cause of action").

14           There are triable issues of fact, however, regarding the conduct of the officers at

15   the time plaintiff fell during the escort.  When plaintiff fell, defendants Cooper, Hestand and

16   Aguinaldo fell on top of plaintiff.  Exhibit J.  When three men of medium build fall on top of

17   someone with the intent to bring that person to the ground, the action could be found to be  an

18   excessive use of force in violation of the Eighth Amendment.  Here, plaintiff scraped his

19   shoulder and it bled.  Evans Depo. at 43:7-25.  The scrape took a month to heal and left a scar,

20   even though the scrape was treated medically.  Id. at 43:18-44:6.  Neither the use of force nor the

21   resulting injury can be determined to be *de minimis* as a matter of law on summary judgment.

22           The state of mind of the defendants also is a triable issue of fact.  Defendants

23   Lynn and Cooper say they thought plaintiff merely tripped.  Interrogatory Responses of Lynn (Set

24
       ───────────────────
25           [15] Plaintiff sought permission to submit his videotape as an attachment to his opposition
       to the motion for summary judgment.  Because plaintiff did not possess the videotape and had no
26   means by which to provide it to the court, defendants' counsel lodged a copy with the court.  The
       attachment is not delineated by a letter or number.

One) at 4:13-14; Interrogatory Responses of Cooper (Set One) at 12-13.  Cooper's falling on top of plaintiff suggests Cooper still felt a need, at least, to restrain him.  Cooper's own statements, however, convey that he did not think plaintiff was intentionally attempting to pull away.  It is for the trier of fact to decide whether Cooper acted with culpable intent when he fell on top of plaintiff.

Given the video images, it also is a triable issue of fact as to whether Hestand and Aguinaldo perceived plaintiff was resisting at the time he was brought to the ground, and whether Aguinaldo tripped plaintiff.

B.    Meal Deprivation

Plaintiff alleges that Aguinaldo refused to give plaintiff a meal on June 10, 2001. Am. Compl. at ¶ 42.  In his deposition, plaintiff states that Aguinaldo deprived him of dinner and that the next meal he received was lunch.  Evans Depo. at 38:20-39:1-2, meaning he missed two meals in a row.  Plaintiff also asserts he heard Aguinaldo state, "That fucker don't deserve shit," when another officer asked Aguinaldo whether plaintiff would be fed.  Evans Depo. at 36:25-37:2.

In Hudson, the Court distinguished between conditions of confinement and excessive force claims, stating that conditions of confinement claims must constitute "extreme deprivations" to be viable.  Hudson, 503 U.S. at 8-9.  "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  Id. at 9.  In addition to this objective requirement, there also is a subjective requirement that the defendants act with deliberate indifference in effecting a deprivation.  Allen v. Sakai, 48 F.3d 1082, 1087 (9th Cir. 1994).

Aguinaldo assets that plaintiff received dinner on the date in question, but does not say who gave him dinner or provide other details eliminating the dispute created by his and plaintiff's competing stories.  Interrogatory Responses of Aguinaldo (Set Two), No. 3.

With regard to the claim that Aguinaldo also acted culpably in depriving plaintiff

1  of breakfast the following morning, that is the same morning plaintiff was transferred to Pelican

2  Bay.  The current record does not make clear whether High Desert or Pelican Bay was

3  responsible for breakfast.

4         The Ninth Circuit has not specifically addressed the factual scenario underlying

5  plaintiff's meal deprivation claim.  It has held that forcing an inmate to sleep without a mattress

6  for one night is insufficient to state an Eighth Amendment violation.  Hernandez v. Denton, 861

7  F.2d 1421, 1424 (9th Cir. 1988).  The Hernandez decision suggests that certain one-time

8  deprivations are not sufficient to support an Eighth Amendment claim.  Other circuits have

9  concluded that missing one meal at a time does not violate the Eighth Amendment.  See Berry v.

10  Brady, 192 F.3d 504, 508 (5th Cir. 1999) (holding that the denial of eight meals over a seven-

11  month period did not violate the Eight Amendment); Cunningham v. Jones, 567 F.2d 653, 659-

12  60 (6th Cir. 1977) (dismissal of complaint alleging prisoner served only one meal a day for 15

13  days remanded for finding of nutritional adequacy).

14         Given the uncertainty of the law regarding a one-time deprivation of two meals in

15  a row, and the factual gaps in the present record, this claim would raise triable issues of fact, but

16  for Aguinaldo's qualified immunity defense, discussed below.  See pages 22-23 infra.

17       C.    Deprivation of Medical Supplies

18         Plaintiff does not know who was responsible for transmitting to him the medical

19  supplies that MTA Martin allegedly left for him at Administrative Segregation.  Plaintiff does not

20  allege that any defendants were present when MTA Martin delivered the supplies or that the

21  defendants had knowledge of the delivery of the supplies.  Am. Compl.¶ 43.

22         Even if plaintiff's pleadings are construed liberally to allege the common law

23  doctrine of joint liability, plaintiff cannot prevail on the deprivation of medical supplies claim.

24  The Seventh Circuit has outlined the doctrine of joint liability in a case, similar to the instant one,

25  /////

26  /////

1   where the facts precluded application of the doctrine.  Fillmore v. Page, 358 F.3d 496, 507 (7th

2   Cir. 2004).  In Fillmore, the court stated:

> In tort law, when each of two defendants performed a negligent act
> that may have produced the plaintiff's injury, but it is impossible to
> know which one really did, courts hold that the two defendants
> may be jointly liable for that single injury.  See, e.g., Summers v.
> Tice, 33 Cal. 2d 80, 199 P.2d 1 (Cal. 1948) (holding two hunters
> jointly liable for a hunting accident where each negligently
> discharged his weapon).

7   Id.  Regarding the instant claim, it has not been established that any defendants have performed

8   an act, let alone a negligent act, that may have caused the deprivation.  Id. at 507.  Therefore,

9   plaintiff fails to state a claim for which relief may be granted.

10   VI.    The Failure To Train and Supervise Claim

11          Plaintiff's second cause of action alleges defendants Lynn, Martin and Van Leer

12   failed to train and supervise the defendants who exerted excessive force against plaintiff.[16]  Am.

13   Compl. ¶ 60.  The court previously has clarified that this claim addresses whether defendants

14   "failed to act to prevent" harm to plaintiff.  See F&Rs at 11; Taylor v. List, 880 F.2d 1040, 1045

15   (9th Cir. 1989) (supervisor may be held liable for constitutional violations "if the supervisor

16   participated in or directed the violations, or knew of the violations and failed to act to prevent

17   them").

18          Because there are triable issues as to whether any escorting defendants violated

19   the Eighth Amendment, see pages 13-17 supra, there are triable issues as to whether defendant

20   Lynn knew of the violations and could and should have taken action to prevent harm to plaintiff.

21   Lynn was present on the escort to Administrative Segregation and thus may have observed

22   Aguinaldo or Corr kick plaintiff's heels.  Lynn also may have observed the manner in which

23   plaintiff's hands were held during the escort to Administrative Segregation, and might have

24

25          [16] Defendants Alameida, Runnels and Colon also are named in this cause of action.
     However, for reasons discussed above, summary judgment should be granted as to defendants
26   Alameida and Runnels and the action against Colon should be dismissed.  See page 1 n.1 and
     page 10 supra.

1   heard plaintiff tell MTA Martin that his restraints were too tight.   If so, Lynn could have in each

2   instance prevented plaintiff's injuries.

3            There is no disputed issue of material fact, however, as to whether defendant

4   Martin could have taken action to prevent harm to plaintiff.  Martin was present on the escort to

5   Receiving and Release.  The only potential Eighth Amendment violation during this escort

6   occurred when Aguinaldo allegedly tripped plaintiff, causing plaintiff to fall, after which

7   Aguinaldo, Hestand and Cooper fell on top of plaintiff and Aguinaldo allegedly kicked plaintiff,

8   all within a split second.  Even if Martin saw what occurred, there was no time for him to prevent

9   any harm to plaintiff.  Defendants have borne their burden of showing there are no triable issues

10  of fact as to Martin.

11           Plaintiff admits in his deposition that defendant Van Leer was not present on

12  either of the escorts.  Evans Depo. at 9:15-10:24.  He does say, though, that Van Leer violated his

13  rights after the escorts by refusing to loosen his restraints.  Defendants have not provided any

14  information regarding Van Leer's conduct, and thus have not eliminated whatever factual dispute

15  exists regarding his culpability.

16  VII.    Qualified Immunity

17           Finally, defendants argue they should be granted summary judgment because they

18  are protected by the doctrine of qualified immunity.

19           Government officials performing discretionary functions generally are shielded

20  from liability for civil damages insofar as their conduct does not violate clearly established

21  statutory or constitutional rights of which a reasonable person would have known.  Harlow v.

22  Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a governmental officer is immune

23  from suit based on the doctrine of qualified immunity, the court must answer two questions.  The

24  first is, taken in the light most favorable to the party asserting the injury, do the facts alleged

25  show the officer's conduct violated a constitutional right?  Saucier v. Katz, 533 U.S. 194, 201

26  (2001).  A negative answer ends the analysis, with qualified immunity protecting defendant from

1    liability.  Id.  If a constitutional violation occurred, a court must further inquire "whether the right

2    was clearly established."  Id.  "If the law did not put the [defendant] on notice that [his] conduct

3    would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.

4    at 202.  The reasonableness of a defendant's conduct is judged "against the backdrop of the law

5    at the time of the conduct."  Brosseau v. Haugen, 543 U.S. 194, 198 (2004).

6            In Brosseau, the Supreme Court emphasized that "the qualified immunity inquiry

7    must be undertaken in light of the specific context of the case."  Id.  In that case, the defendant

8    police officer had shot a fleeing felon in the back.  Id. at 596-97.  The Court found that case law

9    clearly established that in a case involving excessive force "where the officer has probable cause

10   to believe that the suspect poses a threat of serious physical harm," the outcome depends very

11   much on the specific facts of each case.  Id. at 589, 591.  Therefore, the Court held that because

12   the officer's actions fell "in the 'hazy border between excessive and acceptable force,'" the

13   officer was entitled to qualified immunity.  Id. at 591 (internal citation omitted).

14          Brosseau was distinguished in a subsequent Ninth Circuit case, San Jose Charter

15   of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005), in which

16   the police officers had the opportunity to plan their actions ahead of time.  Id. at 978.  In this

17   case, the court stated, "There was no element of surprise coloring the officers' judgment,"  id,

18   and held that qualified immunity did not protect defendants.

19          In the instant case, as discussed above, there are triable issues of fact as to whether

20   the conduct of defendants Aguinaldo, Cooper, Hestand, Ingwerson, Corr, Welch, Lynn and Van

21   Leer violated the Eighth Amendment.  See pages 17-19 supra.  Therefore, the qualified immunity

22   analysis turns on whether it is "clearly established" that the particular manner in which each

23   defendant could be found to have used excessive force violated the Eighth Amendment.

24   Brosseau, 543 U.S. at 98.  If the law was not clearly established, qualified immunity adheres.

25          Taking the facts in the light most favorable to plaintiff as required, Ingwerson

26   refused to loosen plaintiff's leg restraints and Ingwerson and Welch held up plaintiff's arms

during the escort.  It is a clearly established violation of the Eighth Amendment to use force against a prisoner solely for the purpose of inflicting pain.  <u>Hudson</u>, 503 U.S. at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated").  Since <u>Hudson</u>, it is clearly established that an Eighth Amendment violation can occur without significant injury being inflicted.  503 U.S. at 9; <u>see also</u> <u>Oliver</u>, 289 F.3d at 630.  Ingwerson and Welch are not entitled to qualified immunity as to their conduct during the escort to Administrative Segregation.

Like Ingwerson, Van Leer as a supervisor allegedly refused to loosen plaintiff's restraints when asked, after plaintiff was placed in a holding cell in Receiving and Release.  This, too, suggests that Van Leer refused to act in order to make plaintiff uncomfortable.  Van Leer is also not entitled to qualified immunity.

Lynn supervised the escort to Administrative Segregation and may have learned of the tightness of the restraints when Evans complained to MTA Martin.  Evans Depo. at 17:15-25.  As a supervisor, Lynn was in a position to prevent injury to plaintiff.  Therefore, Lynn also is not entitled to qualified immunity.

Corr and Aguinaldo allegedly kicked plaintiff's heels, which is conduct governed by clearly established case law forbidding intentional beating of prisoners.  In <u>Hudson</u>, the officers violated the Eighth Amendment by punching and kicking the plaintiff.  501 U.S. at 4, 10; <u>see also</u> <u>Brooks v. Kyler</u>, 204 F.3d 102, 104 (3d Cir. 2000) (intentional beating of a prisoner violated the Eighth Amendment even though the plaintiff only suffered "abrasions or "scratches" on his neck and hands").  In the instant case, a reasonable supervisor would have known the kicking to be a violation of clearly established law construing the Eighth Amendment; therefore, Lynn is potentially liable for not preventing the kicking.  Furthermore, the officers' actions were not in reaction to an inmate safety threat.  <u>Cf.</u> <u>LeMaire</u>, 12 F.3d at 1454.  Therefore, Corr, Aguinaldo and Lynn are not entitled to qualified immunity with respect to the kicking of plaintiff's heels.

1    During the escort to Receiving and Release, Aguinaldo allegedly tripped plaintiff

2  and then fell on top of plaintiff to restrain him.  Hestand and Cooper also fell on top of plaintiff,

3  even though they say they knew plaintiff was not resisting; Lynn was present as a supervisor.

4  Interrogatory Responses of Lynn (Set One) at 4:13-14; Interrogatory Responses of Cooper (Set

5  One) at 12-13.  Therefore, Aguinaldo, Hestand, Lynn and Cooper are not entitled to qualified

6  immunity.

7    Aguinaldo, however, is entitled to qualified immunity with regard to his allegedly

8  depriving plaintiff of two meals in a row.  In the absence of binding precedent in the Ninth

9  Circuit, the court will look to other circuits to determine whether plaintiff's asserted right to

10  serial meals without interruption was clearly established.  Lum v. Jensen, 876 F.2d 1385, 1387

11  (9th Cir. 1989).  In the Fifth Circuit, the deprivation of eight meals over a seven month period

12  has been found not to violate the Eighth Amendment.  Berry, 192 F.3d at 508.  However, in the

13  Sixth Circuit, being served one meal a day for 15 days could violate the Eighth Amendment.

14  Cunningham, 567 F.2d at 659-60 (dismissal of complaint alleging prisoner served only one meal

15  a day for 15 days remanded for finding of nutritional adequacy).  Because no case has held that

16  forcing a prisoner to miss two meals in a row violates the Eighth Amendment, the law is not

17  "clearly established" in this regard.  Cf. Brosseau, 543 U.S. at 199.

18    Accordingly, IT IS HEREBY RECOMMENDED that:

19    1) The action be dismissed as to Colon.

20    2) Summary judgment be granted in full as to defendants Alameida, Campbell,

21  Carpenter, Celis, Martin, Prater and Runnels.

22    3)  Summary judgment be granted in part to as to the following:

23    a) defendant Aguinaldo as to the deprivation of meal claim; and

24    b) all defendants as to the deprivation of medical supplies claim.

25  /////

26  /////

4) Summary judgment be denied in part as to the following:

a) defendants Aguinaldo, Cooper, Hestand, Ingwerson, Corr and Welch as to the excessive force claim; and

b) defendants Lynn and Van Leer as to the failure to adequately supervise claim.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fifteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within five days after service of the objections.  The parties are advised the failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  March 9, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

2/evansF&R

26